**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

GILBERTO RODRIGUEZ-VEGA,

    **Plaintiff,**

          **v.**                         **Civil No.** 11-2235 (FAB)

POLICLINICA LA FAMILIA DE TOA
ALTA, INC.,

    **Defendant.**

LUZ COLON-RIVERA,

    **Plaintiff,**

          **v.**                         **Civil No.** 11-2236 (FAB)

POLICLINICA LA FAMILIA DE TOA
ALTA, INC.,

    **Defendant.**

**OPINION AND ORDER**[1]

BESOSA, District Judge

    Plaintiff Gilberto Rodriguez-Vega ("plaintiff Rodriguez") and plaintiff Luz Colon-Rivera ("plaintiff Colon") bring claims against defendant Policlinica la Familia de Toa Alta, Inc. ("defendant" or "Policlinica") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Docket No. 1.) Plaintiff Rodriguez brings a claim of sexual harassment and a claim

---

    [1] Katherine Hedges, a second-year student at the University of New Hampshire School of Law, assisted in the preparation of this Opinion and Order.

of third-party retaliation.  (Docket No. 30 at p. 2.)  Plaintiff
Colon brings a claim of a retaliatory hostile work environment,
constructive discharge, and a claim of third-party retaliation.
Id.  Both plaintiffs also bring supplemental Commonwealth claims
pursuant to Law 69, P.R. Laws Ann. tit 29, § 1321; Law 100, P.R.
Laws Ann. tit 29, § 146; and Law 115, P.R. Laws Ann. tit 29, § 149-
149b.   Id. at pp. 2-3.   Plaintiff Rodriguez also brings a
supplemental claim pursuant to Law 17, P.R. Laws Ann. tit 29,
§ 155.  Id. at p. 3.

    Pending before the Court are both defendants' motions for
summary judgment.  (Docket Nos. 21 & 22.)  For the reasons set
forth below, both defendants' motions for summary judgment are
**GRANTED**.

## I.   Procedural History

    On December 20, 2011, plaintiff Rodriguez filed a complaint
against defendant Policlinica alleging sexual harassment and third-
party retaliation pursuant to Title VII and various Commonwealth
laws.  (Docket No. 1.)  On that same day, plaintiff Colon filed a
complaint against the defendant alleging a retaliatory hostile work

environment, constructive discharge, and third-party retaliation.[2]

Complaint, <u>Colon-Rivera v. Policlinica la Familia de Toa Alta, Inc.</u>, No. 11-2236 (D.P.R. filed December 20, 2011).[3]  On March 12, 2012, defendant filed a motion to consolidate the cases, which the Court granted on March 13, 2012.  (Docket No. 6.)

On January 28, 2013, following discovery, defendant moved for summary judgment on each of plaintiffs' claims.  (Docket Nos. 21 & 22.)  On February 21, 2013, plaintiffs filed an opposition. (Docket No. 30.)  On March 11, 2013, defendant replied to plaintiffs' opposition.  (Docket No. 39.)

## II. Summary Judgment Standard

The Court may grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions

---

[2] The Court notes that plaintiffs' complaints seem to include claims other than the ones listed here.  (<u>See</u> Docket No. 1 & Civil Case No. 11-2236 at Docket No. 1.)  In plaintiffs' response to defendant's motion for summary judgment, however, plaintiffs only defend the causes of action listed here. (Docket No. 30.)  Because plaintiffs failed to defend any other cause of action in their summary judgment briefs, any other claim has been waived.  <u>See</u> <u>Leavitt v. Wal-Mart Stores, Inc.</u>, 74 Fed.Appx. 66, 71 (1st Cir. 2003) (finding that claims were not waived when a plaintiff continued to defend them in her summary judgment briefs, even though a footnote could be read to state that there were no other claims); <u>see also</u> <u>Ramírez de Arellano v. Sandrine Corp.</u>, Civil No. 11-1289 (JAF), 2012 WL 899261, at *3 (D.P.R. Mar. 15, 2012) (quoting <u>U.S. v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990)) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[3] Hereinafter "Civil Case No. 11-2236."

on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).
A fact is "material" if it has the potential to "affect the outcome
of the suit under the governing law." Id.  A dispute is "genuine"
when it "could be resolved in favor of either party." Calero-
Cerezo v. U.S. Dep't. of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

     The party moving for summary judgment bears the burden of
showing the absence of a genuine issue of material fact. See
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The party must
demonstrate it through definite and competent evidence. See
Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir.
1994). It must identify "portions of 'the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any'" which support its motion. Id. (citing
Fed.R.Civ.P. 56(c)).

     Once a properly supported motion has been presented, the
burden shifts to the non-moving party "to demonstrate that a trier
of fact reasonably could find in [its] favor." Santiago-Ramos v.
Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)
(internal citation omitted). For issues where the opposing party
bears the ultimate burden of proof, that party cannot merely rely
on the absence of competent evidence, but must affirmatively point

to specific facts that demonstrate the existence of an authentic dispute. See Suarez v. Pueblo Int'l., Inc., 229 F.3d 49 (1st Cir. 2000).

If the non-moving party establishes uncertainty as to the "true state of any material fact, the movant's efforts should be deemed unavailing." See Lopez & Medina Corp. v. Marsh USA, Inc., 694 F.Supp.2d 119, 123 (D.P.R. 2010) (citing Suarez, 229 F.3d at 53). It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). It is necessary, therefore, that "a party opposing summary judgment must 'present definite, competent evidence to rebut the motion.'" Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994) (internal citation omitted). In making this assessment, the Court must take the entire record in the light most favorable to the non-moving party and draw all reasonable inferences in his or her favor. Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 77, 779-80 (1st Cir. 2011). The Court does not, however, "make credibility determinations or weigh the evidence." Anderson, 477 U.S. at 255. The Court may safely ignore, however, "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010).

The First Circuit Court of Appeals has "repeatedly . . .
emphasized the importance of local rules similar to Local Rule 56
[of the District of Puerto Rico]." Hernandez v. Phillip Morris
USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007). Rules such as Local Rule
56 "are designed to function as a means of 'focusing a district
court's attention on what is - and what is not - genuinely
controverted.'" Id. (quoting Calvi v. Knox County, 470 F.3d 422,
427 (1st Cir. 2006)). Local Rule 56 imposes guidelines for both
the movant and the party opposing summary judgment. Loc. Rule 56.
A party moving for summary judgment must submit factual assertions
in "a separate, short, and concise statement of material facts, set
forth in numbered paragraphs." Loc. Rule 56(b). A party opposing
a motion for summary judgment must "admit, deny, or qualify the
facts supporting the motion for summary judgment by reference to
each numbered paragraph of the moving party's statement of facts."
Loc. Rule 56(c). Facts which are properly supported "by record
citations as required by this rule, shall be deemed admitted unless
properly controverted." Loc. Rule 56(e). The Court, may, however,
"disregard any statement of fact not supported by a specific
citation to record material properly considered on summary
judgment." Id. "The court shall have no independent duty to
search or consider any part of the record not specifically
referenced in the parties' separate statement of facts." Id. Due

to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril." <u>Hernandez</u>, 486 F.3d at 7.

### III. Factual Background

#### A.   Statement of Uncontested Facts

Dr. Itza Chevres ("Dr. Chevres") is defendant Policlinica's owner and president. (Docket No. 21-1 at ¶ 3; Docket No. 30-1 at p. 2, ¶ 3.) Plaintiff Colon began working as a licensed practical nurse for the Policlinica in June or July 1998. (Docket No. 22-1 at ¶ 1; Docket No. 30-2 at p. 2, ¶ 1.) Although Dr. Chevres hired her as a nurse, plaintiff Colon also worked as a secretary and Dr. Chevres promoted her to serve as the secretaries' supervisor about four years later. (Docket No. 22-1 at ¶¶ 3-4; Docket No. 30-2 at p. 2, ¶¶ 3-4.) Plaintiff Colon's duties remained unchanged until she stopped working for the Policlinica. (Docket No. 22-1 at ¶ 6; Docket No. 30-2 at p. 2, ¶ 6.)

In 2004, Dr. Chevres' then husband, Jose Gonzalez-Amoros, wrote plaintiff Colon a note asking her to be his "secret friend." (Docket No. 30-2 at p. 6, ¶ 1; Docket No. 39-4 at p. 5, ¶ 1.) Plaintiff Colon complained to Dr. Chevres and said that Gonzalez-Amoros was sexually harassing her. (Docket No. 30-2 at pp. 6-7, ¶¶ 2-4 & 6-7; Docket No. 39-4 at p. 5, ¶¶ 2-4 & 6-7.) Plaintiff Colon then offered her resignation, which led Dr. Chevres to meet

with her about the matter.  (Docket No. 22-1 at ¶ 12; Docket No. 30-2 at p. 3, ¶ 12; Docket No. 30-8 at p. 35.)  They talked about the situation with Dr. Chevres' husband and Dr. Chevres told plaintiff Colon that "it was not her fault" and asked her to continue to work there.  (Docket No. 22-1 at ¶ 12; Docket No. 30-2 at p. 3, ¶ 12; Docket No. 30-8 at p. 35.)

        Plaintiff Rodriguez was hired on November 6, 2007 to work at the Policlinica as an accountant.  (Docket No. 21-1 at ¶¶ 1 & 8; Docket No. 30-1 at pp. 1-3, ¶¶ 1 & 8 & p. 8, ¶ 2; Docket No. 39-1 at p. 8, ¶ 2.)  Plaintiff Rodriguez lived with his mother, next door to Dr. Chevres, until August 2010.  (Docket No. 21-1 at ¶ 2; Docket No. 30-1 at pp. 2, ¶ 2.)  He used to visit Dr. Chevres' house once or twice a week; because their families were related, the two families spent time together outside of work.  (Docket No. 21-1 at ¶¶ 4-5; Docket No. 30-1 at pp. 2-3, ¶¶ 4-5; Docket No. 21-2 at p. 25; Docket No. 39-3 at p. 57.)  Dr. Chevres even referred to plaintiff Rodriguez as her "son."  (Docket No. 21-1 at ¶ 28; Docket No. 30-1 at p. 6, ¶ 28.)  Plaintiff Rodriguez had visited Dr. Chevres' house with a previous girlfriend.  (Docket No. 21-1 at ¶ 35; Docket No. 30-1 at p. 7, ¶ 35.)  He felt that he could speak to Dr. Chevres about anything related to work.  (Docket No. 21-1 at ¶ 28; Docket No. 30-1 at p. 6, ¶ 28.)  Plaintiff Rodriguez also stated that "[a]ll employees at the office spent

time jesting." (Docket No. 21-1 at ¶ 30; Docket No. 30-1 at p. 7,
¶ 30.)

        Plaintiff Colon's and plaintiff Rodriguez's duties were
indirectly related. (Docket No. 21-1 at ¶ 12; Docket No. 30-1 at
p. 4, ¶ 12.) Sometimes when plaintiff Rodriguez prepared payroll,
both plaintiffs reconciled payroll in his office, without anyone
else present. (Docket No. 22-1 at ¶ 14; Docket No. 30-2 at p. 3,
¶ 14; Docket No. 22-2 at pp. 36-38.)

        Prior to November 2010, plaintiff Colon considered
Dr. Chevres a friend. (Docket No. 22-1 at ¶ 10; Docket No. 30-2 at
p. 2, ¶ 10.) On October 30, 2010, Dr. Chevres saw plaintiffs
return to plaintiff Rodriguez's mother's house, where plaintiff
Colon had left her car while they attended a Halloween party.
(Docket No. 22-1 at ¶ 9; Docket No. 30-2 at p. 2, ¶ 9.)

        Plaintiff Colon's "nervousness" with Dr. Chevres began in
November 2010. (Docket No. 22-1 at ¶ 11; Docket No. 30-2 at p. 3,
¶ 11.) On November 1, 2010, when she went to look for a file in
Dr. Chevres' office, Dr. Chevres interrogated plaintiff Colon about
her relationship with plaintiff Rodriguez. (Docket No. 22-1 at
¶ 19; Docket No. 30-2 at p. 3, ¶ 19; Docket No. 22-2 at p. 48.) On
another day, Dr. Chevres called plaintiff Colon on her cell phone
to ask if everything was in order, but plaintiff Colon believed
that Dr. Chevres was really checking to make sure plaintiff Colon

was not contacting plaintiff Rodriguez. (Docket No. 22-1 at ¶ 21;
Docket No. 30-2 at p. 4, ¶ 21; Docket No. 30-8 at p. 56.)

      Dr. Chevres developed an eye condition after having
surgery on her eyelids, and she had trouble seeing clearly.
(Docket No. 22-1 at ¶ 32; Docket No. 30-2 at p. 4, ¶ 32.)
Dr. Chevres also had hearing problems. (Docket No. 21-1 at ¶ 25;
Docket No. 30-1 at p. 6, ¶ 25.) Plaintiff Rodriguez "felt
uncomfortable around Dr. Chevres during the last three months of
employment." (Docket No. 21-1 at ¶ 31; Docket No. 30-1 at p. 7,
¶ 31 & p. 14, ¶ 44.) He claims that Dr. Chevres sexually harassed
him "because when they were working at the computer and he would be
showing something to her on the monitor, she could not see well so
she would approach and brush against him." (Docket No. 21-1
at ¶ 24; Docket No. 30-1 at p. 6, ¶ 24.) "On one occasion
[plaintiff Rodriguez] told [Dr. Chevres] to please keep her
distance." (Docket No. 21-1 at ¶ 26; Docket No. 30-1 at p. 6,
¶ 26; Docket No. 21-2 at p. 107.) "At the time she understood, but
later, since [they] kept on working side by side, sometimes she
would forget and [they] would go back to the same." (Docket
No. 21-1 at ¶ 26; Docket No. 30-1 at p. 6, ¶ 26; Docket No. 21-2 at
p. 107.) Dr. Chevres never told plaintiff Rodriguez that he had to
consent to the harassment in order to remain employed. (Docket
No. 21-1 at ¶ 32; Docket No. 30-1 at p. 7, ¶ 32; Docket No. 21-2 at

p. 129.)   Until his employment was terminated, the terms and conditions of his employment were never changed. (Docket No. 21-1 at ¶ 34; Docket No. 30-1 at p. 7, ¶ 34; Docket No. 21-2 at p. 128.) Plaintiff Rodriguez said he did not know "whether an employer has to take measures when two employees that somehow work together engage in a personal relationship" because there was no one from Human Resources to guide him. (Docket No. 21-1 at ¶ 40; Docket No. 30-1 at p. 8, ¶ 40.)  Plaintiff Rodriguez never complained to anyone at defendant Policlinica about the harassment and only asked how he was performing his work. (Docket No. 21-1 at ¶ 29; Docket No. 30-1 at p. 7, ¶ 29.)

        Plaintiff Colon reported to the State Insurance Fund ("SIF") on December 2, 2010.[4] (Docket No. 22-1 at ¶ 22; Docket No. 30-2 at p. 4, ¶ 22.)  She previously had received psychiatric treatment for the sexual harassment to which Gonzalez-Amoros subjected her. (Docket No. 30-2 at p. 7, ¶ 10; Docket No. 39-4 at p. 7, ¶ 10; Docket 30-8 at p. 111.)  A doctor at SIF diagnosed her with Major Depression. (Docket No. 30-2 at p. 14, ¶ 55; Docket No. 39-4 at p. 19, ¶ 55.)  The SIF discharged her, however, because it determined that her emotional condition was not related to her employment. (Docket No. 22-1 at ¶ 25; Docket No. 30-2 at p. 4,

---

[4] Plaintiff Colon does not explain what SIF is and what are its functions. Her allegations, however, suggest that SIF provides diagnoses and treatment for work-related conditions.

¶ 25.)  Plaintiff Colon appealed SIF's decision, but SIF denied her
appeal because it again determined that her depression was not
related to her employment, but to the harassment by Gonzalez-
Amoros.  (Docket No. 30-2 at p. 14, ¶¶ 56-60; Docket No. 39-4 at
pp. 19-20, ¶¶ 56-60.)   She resigned from the Policlinica on
August 18, 2011.  (Docket No. 22-1 at ¶ 28; Docket No. 30-2 at
p. 4, ¶ 28; p. 17, ¶ 81; Docket No. 39-4 at p. 25, ¶ 81.)  The
letter of resignation, which she wrote months after filing her
administrative complaint, stated that she was "forced to resign due
to the oppressive conditions of employment, the continuous
humiliations, yelling, threats, disrespectful conduct and having to
submit to intense interrogatories regarding her personal life."
(Docket No. 30-2 at pp. 17-18, ¶ 82; Docket No. 39-4 at p. 25,
¶ 84; Docket No. 42-5.)  Plaintiff Colon never requested that she
be reinstated to her job at the Policlinica.  (Docket No. 22-1 at
¶ 26; Docket No. 30-2 at p. 4, ¶ 26.)

        On December 31, 2010, while he was on sick leave,
defendant Policlinica terminated plaintiff Rodriguez from his
position, indicating that it had eliminated the position because it
had outsourced the accounting functions.  (Docket No. 30-1 at
p. 14, ¶ 46; Docket No. 39-1 at p. 20, ¶ 46; Docket No. 42-1.)  The
dismissal letter, however, does not reference any reorganization
plan.  (Docket No. 30-1 at p. 15, ¶ 55; Docket No. 39-1 at p. 22,

¶ 55.)   The decision to eliminate plaintiff Rodriguez's position was made on the same day he received the termination letter; his position was the only one considered for elimination at that time. (Docket No. 30-1 at p. 15, ¶¶ 52-53; Docket No. 39-1 at p. 21, ¶¶ 52-53.)

Plaintiff Rodriguez was aware that the Policlinica had financial difficulties and that it was looking into restructuring. (Docket No. 21-2 at ¶ 20; Docket No. 30-1 at p. 5, ¶ 20; Docket No. 21-2 at p. 99.)   The rest of defendant's employees were not notified of the reorganization plan until after Three King's Day, after plaintiff Rodriguez's position had been eliminated.  (Docket No. 30-1 at p. 15, ¶ 54; Docket No. 39-1 at p. 22, ¶ 54.)

David Lopez[5] e-mailed Dr. Chevres on February 4, 2011, saying:

> It is important to stress that the suspension of [plaintiff Rodriguez] was due to reasons of the elimination of his position because it was understood that there was no need for a full-time [sic] and not for poor performance. We shall be careful in regards to the allegations that are made regarding this because this is secondary and was not the basis for the decision.

(Docket No. 30-1 at p. 16, ¶ 57; Docket No. 39-1 at p. 22, ¶ 57.)

---

[5] It appears from Dr. Chevres' deposition that David Lopez participated in an analysis of changes in the administrative processes at defendant Policlinica, but his relationship to the Policlinica is unclear.  (Docket No. 30-4 at p. 102.)

Carlos Arguinzoni, who had previously performed some work for the Policlinica in December 2010, signed a professional services contract with defendant on January 10, 2011 and assumed some of plaintiff Rodriguez's former duties. (Docket No. 30-1 at pp. 14-15, ¶¶ 47, 49 & 50; Docket No. 30-7; Docket No. 39-1 at p. 21, ¶ 50.)

Plaintiff Rodriguez and plaintiff Colon became romantically involved in the middle or end of December 2010, after plaintiff Colon had stopped working at the Policlinica because she had reported to the SIF. (Docket No. 21-1 at ¶ 15; Docket No. 22-1 at ¶ 29; Docket No. 30-1 at p. 5, ¶ 15; Docket No. 30-2 at p. 4, ¶ 29.) Neither plaintiff ever informed Dr. Chevres of plaintiff Colon's romantic involvement with plaintiff Rodriguez. (Docket No. 21-1 at ¶ 16; Docket No. 22-1 at ¶ 33; Docket No. 31-1 at p. 5, ¶ 16; Docket No. 30-2 at p. 4, ¶ 33.)

On January 25, 2011, plaintiff Rodriguez and plaintiff Colon went together to file their administrative anti-discrimination claims with the Anti-discrimination Unit of the Department of Labor of Puerto Rico. (Docket No. 21-1 at ¶¶ 36-37; Docket No. 30-1 at p. 7, ¶¶ 36-37; Docket No. 22-1 at ¶ 36; Docket No. 30-2 at p. 5, ¶ 36.) Plaintiff Rodriguez did not file any sexual harassment complaint prior to his dismissal. (Docket No. 21-1 at ¶ 38; Docket No. 30-1 at p. 8, ¶ 38.) Plaintiff

Rodriguez did not have anything to do with plaintiff Colon's reporting to the State Insurance Fund. (Docket No. 21-1 at ¶ 39; Docket No. 30-1 at p. 8, ¶ 39.)

   **B.   Statement of Contested Facts**

   Plaintiff Rodriguez alleges that when Dr. Chevres found out that he was the coach of "The Killers" volleyball team, she questioned him about "why had he not told her that he was 'Colon's coach.'"[6] (Docket No. 30-1 at p. 9, ¶ 8.) Plaintiff Rodriguez said that he "was not only [plaintiff Colon]'s coach but that [he] was the coach to an entire team," that the former team owner had asked him to coach the team, and that it had nothing to do with his job. (Docket No. 30-1 at p. 9, ¶ 9.) Dr. Chevres then allegedly asked if plaintiff Rodriguez had "anything going on with" plaintiff Colon, which he denied. (Docket No. 30-1 at p. 9, ¶ 10.)

   When Dr. Chevres was not in the office, she repeatedly called plaintiff Rodriguez after working hours to find out how things were at the Policlinica. (Docket No. 30-1 at p. 11, ¶¶ 23-24.) During October 2010, after overhearing plaintiff Rodriguez's

_____

[6] It is uncontested that plaintiff Colon played for a volleyball team called "The Killers." (Docket No. 22-1 at ¶ 7; Docket No. 30-2 at p. 2, ¶ 7.) Plaintiff Rodriguez became the coach of "The Killers" when he was working for defendant. (Docket No. 22-1 at ¶ 8; Docket No. 30-2 at p. 2, ¶ 8.) During a lunch between Dr. Chevres, plaintiff Rodriguez, plaintiff Colon, and an unknown employee, plaintiff Rodriguez mentioned that he was coaching "The Killers." (Docket No. 30-1 at p. 8, ¶¶ 4-5; Docket No. 39-1 at p. 9, ¶¶ 4-5.)

telephone call while they were riding in the car together,
Dr. Chevres asked why plaintiff Rodriguez had not told her that he
had moved.  (Docket No. 30-1 at p. 11, ¶ 25.)  Plaintiff "told
[Dr.] Chevres that he saw no need to discuss the matter of his
move" with her.  (Docket No. 30-1 at p. 11, ¶ 26.)  Plaintiff
Rodriguez alleges that Dr. Chevres' romantic partner, Rafael Fabre,
noticed that Dr. Chevres had been keeping track of plaintiff
Rodriguez, even on the weekends.  (Docket No. 30-1 at p. 11, ¶ 27.)
It was not unusual for Dr. Chevres to ask plaintiff Rodriguez about
his weekend, especially when she had not seen him.  (Docket No. 30-
1 at p. 11, ¶ 28.)

      Dr. Chevres always spoke to plaintiff Rodriguez alone,
either at her office or his office.  (Docket No. 30-1 at p. 9,
¶ 11.)  Plaintiff Colon shared an office with Dr. Chevres, and
whenever Dr. Chevres finished "questioning [plaintiff] Rodriguez
about personal matters she locked herself in with [plaintiff Colon]
in their office."  (Docket No. 30-1 at p. 10, ¶¶ 12-13.)  Plaintiff
Rodriguez stated that he saw plaintiff Colon crying on several
occasions, which plaintiff Colon and Dr. Chevres told him was a
result of Dr. Chevres inquiring about the plaintiffs' relationship.
(Docket No. 30-1 at p. 10, ¶¶ 14-16; Docket No. 30-2 at p. 10,
¶ 31.)  Plaintiff Rodriguez said that he was present for some

conversations, but never the ones where plaintiff Colon left crying. (Docket No. 30-1 at p. 10, ¶¶ 17-18.)

Plaintiff Colon alleges that on November 1, 2010, she went to look for a file in Dr. Chevres' office and Dr. Chevres begged to be told "what was [her] relationship with [plaintiff Rodriguez]" and told plaintiff Colon "that it was very harmful for her." (Docket No. 30-2 at pp. 7-8, ¶¶ 12-13.) Plaintiff Colon said it made her very embarrassed and "it was as if she was 'claiming something.'" (Docket No. 30-2 at p. 8, ¶¶ 14-15.) Plaintiff Colon said she and plaintiff Rodriguez were only friends and asked to have her personal life respected. (Docket No. 30-2 at p. 8, ¶ 7.) Dr. Chevres responded, "Even if I don't like it, I have to swallow it." Id. Plaintiff Rodriguez alleges that he saw plaintiff Colon leaving the office, crying. (Docket No. 30-1 at p. 12, ¶ 34.) Plaintiff Rodriguez alleges that Dr. Chevres also asked him about his weekend, and the inquiry shocked him "'on account of the manner in which she asked' him, 'such as to extract information about something.'" (Docket No. 30-1 at p. 12, ¶ 30.)

Plaintiff Rodriguez also alleges that Dr. Chevres wore tight, low-cut dresses and would not wear underwear to work, which he knew because she "would talk to him about things that she had to speak to (him) about and about things she didn't have to speak to (him) about." (Docket No. 30-1 at p. 13, ¶ 38.) One time,

plaintiff Rodriguez watched Dr. Chevres pick up a slip of paper in his office and, as he watched her, he noticed she was not wearing underwear. Id. He said it made him very uncomfortable. Id.

Plaintiff Rodriguez alleges that he spoke with Dr. Chevres about the environment at work on several occasions and asked if she had any complaints about his work. (Docket No. 30- at p. 14, ¶ 41.) She said that she did not have any complaints about his work and that his work was excellent. Id. He alleges that there was no one else to which to complain because defendant did not have a Human Resources chief and Dr. Chevres was the boss. (Docket No. 30-1 at p. 14, ¶ 42.) Plaintiff Rodriguez states that he considered his work environment in November and December 2010 a "martyrdom" and he began to take medication because his work anxiety was making it hard for him to sleep. (Docket No. 30-1 at p. 14, ¶ 45.)

On another occasion, Dr. Chevres allegedly addressed plaintiff Colon in a loud tone of voice and repeatedly said, "Everything Ok?, Everything Ok?  Well, that's the way it should be." (Docket No. 30-2 at p. 9, ¶ 20; p. 11, ¶ 39.) Dr. Chevres also allegedly warned her, saying, "Do not make me act as another type of boss." (Docket No. 30-2 at p. 12, ¶ 42.) Plaintiff Colon said she took that to mean Dr. Chevres would not talk to her or would fire her. Id. Plaintiff Colon contends that Dr. Chevres'

tone of voice made her know that Dr. Chevres was threatening her to stay away from plaintiff Rodriguez.   (Docket No. 30-2 at p. 9, ¶ 22.)   Dr. Chevres allegedly warned plaintiff Colon that her children would be grateful if she stayed away from plaintiff Rodriguez.   (Docket No. 30-2 at p. 12, ¶ 44.)

Plaintiff Colon said that the confrontations made her nervous and "she could not control her sphincters."   (Docket No. 30-2 at p. 9, ¶¶ 21 & 24-25.)   Plaintiff Colon claims that Dr. Chevres addressed her in a changed tone of voice after November 1, 2010 and mistreated her whenever they crossed paths. (Docket No. 30-2 at pp. 9-10, ¶¶ 26 & 28.)   Plaintiff Colon said she was afraid that Dr. Chevres would attack her, even though Dr. Chevres never physically assaulted her.   (Docket No. 30-2 at p. 10, ¶¶ 29-30.)

One day, Dr. Chevres had swollen eyes and told plaintiff Rodriguez that she "had spent the entire night crying because she felt betrayed by some people."   (Docket No. 30-1 at p. 13, ¶ 36; 33 Docket No. 30-2 at p. 10, ¶ 33.)   Plaintiff Colon also asked Dr. Chevres what was wrong, and she admitted she had been crying. (Docket No. 30-2 at p. 10, ¶ 34.)   Plaintiff Colon claims that Dr. Chevres told her she felt betrayed because of the perceived relationship between plaintiffs due to the Gonzalez-Amoros incident years earlier.   (Docket No. 30-2 at p. 10, ¶ 37.)   On another

occasion, plaintiff Rodriguez "had a friendly exchange" with Dr. Joann Padilla, another doctor at the Policlinica, in the presence of Dr. Chevres.  (Docket No. 30-1 at p. 13, ¶ 37.) Dr. Chevres asked plaintiff Rodriguez "if (he) was also dating (Padilla) during off-duty hours."  Id.

One day, after speaking to Dr. Chevres on the phone, plaintiff Colon felt sick to her stomach and asked one of the Policlinica's doctors for a referral to a psychiatrist.  (Docket No. 30-2 at p. 12, ¶ 46.)  Plaintiff Colon states that Dr. Chevres called her the next day and asked if everything was in order. (Docket No. 30-2 at p. 13, ¶ 48.)  When she said it was, Dr. Chevres said, "That is the way it has to be."  Id.  Defendant Policlinica denies all of these allegations and says that they are unsupported. (Docket No. 39-4 at pp. 8-19.)

Plaintiff Colon additionally states that she believes Dr. Chevres mistreated her during this time because of "the sexual harassment perpetrated by Gonzalez-Amoros."  (Docket No. 30-2 at p. 15, ¶ 61.)  Defendant Policlinica denies this allegation and notes that events related to harassment by Gonzalez-Amoros are time-barred.  (Docket No. 39-4 at p. 20, ¶ 61.)  Plaintiff Colon said that after she was released from SIF, she "had two options, either quit or be submitted to the pressure, harassment, and emotionally (she) could not work with the doctor." (Docket No. 30-

2 at p. 16, ¶ 69.)  When plaintiff Colon was asked to identify the

hostility of her work environment, she said "she was forced to work

in an environment where she was constantly scolded, yelled at and

talked to in a loud voice for matters that were not related to job

performance."  (Docket No. 30-2 at p. 16, ¶ 70.)  She further

stated that Dr. Chevres "insisted that [plaintiff] Colon was

accustoming [plaintiff Rodriguez] to 'something else,'" which she

understood to refer to "something sexual." Id.  She also alleges

that Dr. Chevres told plaintiff Rodriguez that plaintiff Colon was

"a woman with experience" and "would sleep around with different

men, [] liked to take their money, among other things."  (Docket

No. 30-1 at p. 10, ¶ 21; Docket No. 30-2 at p. 16, ¶¶ 70-71.)

Dr. Chevres also warned plaintiff Rodriguez "to not approach

[plaintiff Colon], that she was a woman with children . . . with

vast experience." (Docket No. 30-1 at p. 11, ¶ 22.0)

        Plaintiff Colon states that she complained of the

retaliation to Dr. Chevres.  (Docket No. 30-2 at p. 17, ¶ 75.)

Defendant Policlinica denies this allegation as unsupported.

(Docket No. 39-4 at p. 24, ¶ 75.)  Plaintiff Colon also states that

she developed ulcers due to the stress from work and feels as if

she will get a panic attack when in front of an authority figure.

(Docket No. 30-2 at p. 17, ¶¶ 79-80.)  Defendant says this is

unsupported and that plaintiff Colon never attempted to return to

defendant after reporting to SIF on December 2, 2010. (Docket
No. 39-4 at p. 25, ¶¶ 79-80.)

        Plaintiff Rodriguez alleges that Dr. Chevres fired him
because when he went on sick leave, defendant needed to get the
payroll out, so they urgently brought in someone for "a specific
period of time and since they were reorganizing she realized they
could manage the payroll without having somebody on a full-time
basis." (Docket No. 30-1 at p. 15, ¶ 51.) He also believes he was
terminated "because he could not work well in the hostile
environment [Dr.] Chevres created as a revenge for his expressed
disagreement with [her] attempts to meddle into his private life,
particularly his relationship with [plaintiff Colon]." (Docket
No. 30-1 at p. 16, ¶ 56.) After his position was eliminated,
plaintiff Rodriguez "felt discouraged, depressed . . . had to go
through a lot before (he) went back to being the same person," and
he remained unemployed for three to five months. (Docket No. 30-1
at p. 16, ¶ 58.)

        Defendant denies all of these allegations. (Docket 39-1;
Docket No. 39-4.)

## IV.  DISCUSSION

        Defendant Policlinica moves for summary judgment on the
following grounds:  (1) the Policlinica did not have fifteen
employees in 2009 or 2010 and, therefore, is not an employer

pursuant to Title VII; (2) neither plaintiff Rodriguez nor plaintiff Colon can establish that they were retaliated against or subject to third-party retaliation; (3) plaintiff Rodriguez cannot show evidence from which a jury could reasonable infer he was sexually harassed; (4) plaintiff Colon cannot establish a gender discrimination claim; (5) a jury cannot reasonably infer that plaintiff Colon was constructively discharged; and (6) plaintiffs also fail to establish claims pursuant to Commonwealth anti-discrimination and retaliation law or, alternatively, that the Court should decline to exercise supplemental jurisdiction over the Commonwealth claims.  (Docket Nos. 21-22 & 39.)  The Court addresses each argument in turn.

### A.   Whether Defendant Policlinica Constitutes an "Employer" Under Title VII

Defendant Policlinica first asks the Court to grant summary judgment in its favor on all claims in the consolidated cases because it should not be considered an employer pursuant to Title VII because it had less than fifteen employees during the alleged discrimination.  (Docket No. 21 at pp. 7-10; Docket No. 22 at pp. 7-10.)  To support this contention, defendant Policlinica cites to a list of employees who received Christmas bonuses in 2009 and another spreadsheet titled "Policlinica la Familia Toa Alta, Inc. - List of Employees During Year 2010."  (Docket Nos. 21-3, 21-

4, 26-1 & 26-2.)   Plaintiffs argue that these documents fail to comply with the admissibility requirements of the Federal Rules of Evidence[7] and, additionally, that the Policlinica failed to list at least six physicians who they argue should be counted as employees. (Docket No. 30 at pp. 12-14.)   To support their argument, plaintiffs cite to the doctors' professional services contracts, which plaintiffs argue proves the doctors in question were employees and not independent contractors. Id.; Docket Nos. 30-9, 35-2 & 42-4.   Additionally, plaintiffs argue that Dr. Chevres should be counted as an employee.  (Docket No. 30 at pp. 12-14.) Defendant Policlinica responds that its documents supporting its position are admissible, that the doctors' professional services contracts prove that the doctors are independent contractors, that Dr. Chevres cannot be counted as an employee because she is defendant's owner, and, therefore, that it is entitled to summary judgment on the Title VII claims.  (Docket No. 39 at pp. 7-10.)

Generally, Title VII of the Civil Rights Act of 1964 prohibits discrimination against employees "because of such

---

[7] The Court finds that the documents are admissible because defendant provided an affidavit, (Docket No. 22-7), from defendant's custodian of business records, verifying the authenticity of the documents under penalty of perjury.   See Fed.R.Evid. 803(6) & 902; see also Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 30 n.13 (1st Cir. 2011)(noting that there was no error in considering statements for a motion for summary judgment when the custodian of the records submitted an affidavit confirming the reliability of the records).

individual's race, color, religion, sex, or national origin."  42

U.S.C. § 2000e-2.  Title VII only applies to an "employer," which

the statute defines as "a person engaged in an industry affecting

commerce who has fifteen or more employees for each working day in

each of twenty or more calendar weeks in the current or preceding

calendar year . . ."  42 U.S.C. § 2000e(b).  Title VII defines an

"employee" as "an individual employed by an employer . . ."  42

U.S.C. § 2000e(f).  The Supreme Court addressed the circular

definition of "employee" in federal anti-discrimination laws in

several cases, De Jesus v. LTT Card Serv., Inc., 474 F.3d 16, 21

(1st Cir. 2007), creating a standard to determine who is considered

an employee pursuant to Title VII.

     **1.**   **Whether Defendant Policlinica Had Less Than Fifteen
Employees on Payroll During 2010**

       To be considered an employee that an employer "has,"

an employer must have an employment relationship with the

individual at that time, regardless of whether or not that

individual worked on the day in question.  Walters v. Metro. Educ.

Enter., Inc., 519 U.S. 202, 204 (1997).  The First Circuit Court of

Appeals has stated that "the 15-employee question will frequently,

but not necessarily, be addressed in two parts:  application of the

"payroll method," followed by application of traditional agency law

principles for defining employer and employee, if the individual is

Civil No. 11-2235 & Civil No. 11-2236 (FAB)                    26

on the payroll." De Jesus, 474 F.3d at 21.   According to the
documents that the Policlinica submitted, it had fifteen or more
employees on its payroll for only seventeen weeks during 2010.  See
Docket Nos. 21-4 & 26-2.

## 2.   Whether Dr. Chevres is an Employee

          Plaintiffs argue that because Dr. Chevres is listed
on the 2010 payroll list, she should be counted as an employee as
well.  (Docket No. 30 at pp. 12-13.)  Plaintiffs admit, however,
that Dr. Chevres "is the [Policlinica's] Owner, President and Vice-
President."  (Docket No. 30-1 at p. 2.)   "[A]n employer is the
person, or group of persons, who owns and manages the enterprise."
Clackamas Gastroenterology Assoc., P.C. v. Wells, 538 U.S. 440, 450
(2003).  While the individual's title is not determinative when
determining if an individual is an employee or proprietor, "[t]he
employer can hire and fire employees, can assign tasks to employees
and supervise their performance, and can decide how the profits and
losses of the business are to be distributed."  Id.  Other than
pointing to her presence on payroll, plaintiffs fail to present any
other reason why Dr. Chevres can be considered an employee.  See
Docket No. 30.  Plaintiff Rodriguez stated that "[n]o one had
higher authority than [Dr.] Chevres at [defendant]."  (Docket
No. 30-1 at p. 14.)  Even taking all reasonable inferences in favor
of plaintiffs, Farmers Ins. Exch., 632 F.3d at 79-80, there is no

Civil No. 11-2235 & Civil No. 11-2236 (FAB)                    27

evidence in the record to suggest that Dr. Chevres is an employee rather than an employer because she is in charge of hiring and firing employees and assigning tasks.  Furthermore, she is the sole owner of defendant Policlinica.  Thus, her presence on defendant's payroll list fails to bring the number of employees above the threshold for defendant to be considered an employer pursuant to Title VII.

### 3. Whether Defendant Policlinica's Doctors are Employees or Independent Contractors

Plaintiffs also argue that there were at least seven additional employees during 2010 because defendant Policlinica failed to list the doctors it employed on the employee list. (Docket No. 30 at pp. 13-14.)  In support of this contention, it submitted a copy of a doctor's contract with the Policlinica. (Docket Nos. 30-9, 35-2, 42-3 & 42-4.)  Although the only full length contract submitted was for Dr. Edna Robles Rivera, plaintiffs state that the remaining physicians' contracts were identical to hers. (Docket Nos. 30-9, 42-3; Docket No. 30 at p. 13.)  Defendant Policlinica points to the same contracts to support their position that these physicians were independent contractors rather than employees and, therefore, should not be counted towards the fifteen employee requirement. (Docket No. 39 at pp. 9-10.)

Civil No. 11-2235 & Civil No. 11-2236 (FAB)                28

          The First Circuit Court of Appeals found that the

common law agency test should be used to determine whether an

individual is an employee or an independent contractor pursuant to

Title VII.  Alberty-Velez v. Corporacion de Puerto Rico para la

Difusion Publica, 361 F.3d 1, 6 (1st Cir. 2004).  In applying the

common law test, the court must weigh:

> the hiring party's right to control the manner and means
> by which the product is accomplished.  Among other
> factors relevant to this inquiry are the skills required;
> the source of the instrumentalities and tools; the
> location of the work; the duration of the relationship
> between the parties; whether the hiring party has the
> right to assign additional projects to the hired party;
> the extent of the hired party's discretion over when and
> how long to work; the method of payment; the hired
> party's role in hiring and paying assistants; whether the
> work is part of the regular business of the hiring party;
> whether the hiring party is in business; the provision of
> employee benefits; and the tax treatment of the hired
> party.

Id. at 7 (quoting Dykes v. DePuy, Inc., 140 F.3d 31, 37-38 (1st

Cir. 1998)).  While no factor is determinative, "in most

situations, the extent to which the hiring party controls 'the

manner and means' by which the worker completes her task will be

the most important factor in the analysis." Id. (citing Eisenberg

v. Advance Relocation & Storage, Inc., 237 F.3d 111, 114 (2nd Cir.

2000)).

          The contract that plaintiffs submitted indicates

many factors supporting the Policlinica's contention that the

doctors are independent contractors.  The doctors work according to mutually agreed upon hours; the contract labels the doctors as independent contractors; the doctors are responsible for their own medical malpractice insurance; and the doctors are not eligible for "vacation leave, sick leave, retirement, professional liability policy, Social Security, and State Insurance Fund payments." (Docket No. 42-3.)  There are, however, a few factors weighing in favor of the doctors being considered employees.  For instance, defendant Policlinica pays the doctors a salary and the doctors are eligible for ten days of vacation.  Id.  The contract also provides that the Social Security contribution will be paid out of the doctor's salary.  Id.  Whether the Social Security payment supports the position that the doctors are independent contractors or not is inconclusive because it is unclear if the doctors are paying the Social Security payment that an independent contractor would do, or the reduced amount that an employee would pay in addition to the employer's contribution.  Most importantly, the contract fails to provide sufficient evidence of how much control the Policlinica has over the "manner and means" of the doctors' work.  Defendant Policlinica failed to submit any additional evidence of the employment relationship between the doctors and it.

      Without further evidence of how the doctors are treated for Social Security and the amount of control defendant

Policlinica has over how the doctors carry out their work, a genuine dispute of material fact remains about whether the doctors constitute employees or independent contractors.  If the doctors are employees pursuant to Title VII, then the Policlinica would have more than fifteen employees and would be considered an employer pursuant to Title VII.  Thus, the Court **DENIES** defendant Policlinica's request for summary judgment on the grounds that it is not an employer pursuant to Title VII.

### B.   Plaintiffs' Third-Party Retaliation Claims

Defendant Policlinica next requests summary judgment on plaintiffs' third-party retaliation claims.  (Docket No. 21 at pp. 20-21; Docket No. 22 at pp. 18-20.)  Title VII states that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  The Supreme Court recently held that because "Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination,'" a woman's fiancé had standing to file a Title VII claim when he was fired after she filed a sexual harassment charge.  Thompson v. N. Am. Stainless, L.P., 131 S.Ct. 863, 870 (2011).  The Court, however,

declined to identify the types of relationships that are protected
from third-party retaliation.  Id. at 868.  The Court instead noted
that firing a close family member would almost always be protected,
but "inflicting a milder reprisal on a mere acquaintance will
almost never" be protected.  Id.  Thus, a plaintiff can establish
a third-party retaliation claim by demonstrating:  (1) that someone
closely related engaged in an activity protected by Title VII,
(2) that the plaintiff suffered an adverse employment action after
or contemporaneously to the protected activity, and (3) that there
is a causal link between the protected activity and the adverse
employment action.  See id. at 868-69.

        An employee has engaged in a protected activity pursuant
to Title VII if he or "she has either (1) 'opposed any practice
made an unlawful employment practice' by Title VII or (2) 'made a
charge, testified, assisted, or participated in any manner in an
investigation, proceeding or hearing' under Title VII." Fantini v.
Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (quoting Long v.
Eastfield Coll., 88 F.3d 300, 304 (5th Cir. 1996)).  The practice
opposed does not actually have to be a violation of Title VII,
because the plaintiff must "demonstrate only that [he or she] had
a 'good faith, reasonable belief that the underlying challenged
actions of the employer violated the law.'"  Id. (quoting Wimmer v.
Suffolk Cnty. Police Dept., 176 F.3d 125, 134 (2nd Cir. 1999)).

Civil No. 11-2235 & Civil No. 11-2236 (FAB)                    32

The opposition clause protects "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Id. (internal citations omitted).

        Defendant Policlinica states that both plaintiffs' third-party retaliation claims fail because they filed their discrimination claims only after plaintiff Rodriguez was fired and plaintiff Colon resigned, so there was no retaliation for an action protected by Title VII. Id. Plaintiffs respond that the protected action plaintiff Rodriguez took was that he "objected and repudiated the unlawful conduct" of Dr. Chevres and that plaintiff Colon was subjected to a hostile work environment as a result. (Docket No. 30 at p. 35.) Plaintiffs fail to argue what protected action plaintiff Colon took. See id. The only matter that plaintiff Colon can argue is a protected action is her statement that she was retaliated against when she told Dr. Chevres that "she could not continue paying for what had happened years earlier with Gonzalez-Amoros." Id. at p. 29. Taking reasonable inferences in the non-moving party's favor, the Court assumes this is the protected conduct for which plaintiff Rodriguez argues he was subjected to third-party retaliation.

First, the Court finds that plaintiffs did not have the kind of relationship protected in third-party retaliation claims. Plaintiffs did not even start their romantic relationship until after plaintiff Colon ceased working at the Policlinica.  (Docket No. 21-1 at ¶ 15; Docket No. 22-1 at ¶ 29; Docket No. 30-1 at p. 5, ¶ 15; Docket No. 30-2 at p. 4, ¶ 29.)  Furthermore, plaintiffs both say that they told Dr. Chevres they were only friends and never admitted to having a romantic relationship.  (Docket No. 21-1 at ¶ 16; Docket No. 22-1 at ¶ 33; Docket No. 31-1 at p. 5, ¶ 16; Docket No. 30-2 at p. 4, ¶ 33.)  Plaintiffs also allege that Dr. Chevres asked plaintiff Rodriguez if he was dating another doctor around the same time she asked about plaintiff Colon. (Docket No. 30-1 at p. 13, ¶ 37.)  The Court finds that people that have been suspected of dating each other do not have the type of close relationship that third-party retaliation claims are designed to protect because taking action against a suspected romantic partner is not likely to dissuade a reasonable worker from reporting harassment.  See Thompson, 131 S. Ct. at 868-69. Additionally, as discussed below, the Court finds that plaintiffs fail to show they engaged in any action protected by Title VII and, therefore, cannot show a connection between a protected action and any adverse employment action.

### 1.    Plaintiff Rodriguez's Third-Party Retaliation Claim

Plaintiff Rodriguez claims that he was fired as retaliation for having a romantic relationship with plaintiff Colon.  (Docket No. 30 at p. 35.)  Plaintiffs present no argument that having a romantic relationship with a co-worker is an activity that Title VII protects.  Alternatively, plaintiff Colon states that she opposed Dr. Chevres's behavior when she told Dr. Chevres that she could no longer be held responsible for something that happened eight years ago.  Id. at p. 29.

No reasonable jury could conclude, however, that having a romantic relationship is an opposition to conduct that is unlawful pursuant to Title VII because having a romantic relationship does not oppose discriminatory conduct.  Therefore, plaintiff Rodriguez's first argument for third-party retaliation fails.  Plaintiffs do allege, however, that plaintiff Colon opposed what she believed to be Dr. Chevres' unlawful conduct when she told her that she could no longer be held responsible for the previous sexual harassment she suffered from Dr. Chevres' husband.  Plaintiffs fail, however, to provide any support for this argument, other than references their own complaints.  See Docket No. 30 at p. 29.  The Court may "disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment."  Loc. Rule 56(e).  The complaint

is not a part of the record considered for summary judgment.  See
Fed.R.Civ.P. 56(c).  Therefore, taking all reasonable inferences in
favor of the non-moving party, Farmers Ins. Exch., 632 F.3d at 79-
80, no reasonable juror could find that plaintiff Colon engaged in
conducted protected by Title VII or that plaintiff Rodriguez was
retaliated against for such conduct.   Thus, the Court **GRANTS**
defendant's motion for summary judgment on plaintiff Rodriguez's
third party retaliation claim.

### 2.   Plaintiff Colon's Third-Party Retaliation Claim

Plaintiff Colon contends that she was retaliated
against because Dr. Chevres perceived her to be in a relationship
with plaintiff Rodriguez.  (Docket No. 30 at pp. 35-36.)  Taking
reasonable inferences in her favor, the Court concludes that
plaintiff Colon's third party retaliation claim could be based on
some action plaintiff Rodriguez took to oppose Dr. Chevres'
unlawful conduct.  Plaintiffs simply state that plaintiff Rodriguez
"objected and repudiated the unlawful conduct" of Dr. Chevres.  Id.
at p. 35.

The properly supported facts that plaintiffs provide
show that plaintiff Rodriguez never complained of sexual
harassment; he only asked how he was performing at work.  (Docket
No. 21-1 at ¶ 29; Docket No. 30-1 at p. 7, ¶ 29.)  Additionally,
when he was uncomfortable with Dr. Chevres standing so close to him

that she "brushed against him," he asked her to stop and she complied, although she "forgot" later.  (Docket No. 21-1 at ¶ 26; Docket No. 30-1 at p. 6, ¶ 26; Docket No. 21-2 at p. 107.)  Judging these facts in the light most favorable to plaintiff Rodriguez, the Court assumes for the purpose of this claim that he believed that Dr. Chevres was violating Title VII when she brushed against him. He also indicates, however, that she stopped when he asked her to do so.  Plaintiff Rodriguez's actions do not rise to the level of actions previously protected through the opposition clause of Title VII.  Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (listing "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges as examples of activity protected pursuant to Title VII).

        Plaintiffs also fail to argue any factual link between plaintiff Rodriguez's request for Dr. Chevres to stop brushing up against him and any adverse employment action taken against plaintiff Colon.  See Docket No. 30 at pp. 34-36. Furthermore, in her statement of uncontested facts, plaintiff Colon states that she believes Dr. Chevres mistreated her during this time because of "the sexual harassment perpetrated by Gonzalez-

Civil No. 11-2235 & Civil No. 11-2236 (FAB)                    37

Amoros." (Docket No. 30-2 at p. 15, ¶ 61.) Because plaintiff Colon cannot provide support for her contention that adverse employment actions were taken against her because of plaintiff Rodriguez's actions, no reasonable jury would find such a link. Therefore, the Court **GRANTS** defendant's motion for summary judgment on plaintiff Colon's third-party retaliation claim.

**C.   Plaintiff Rodriguez's Sexual Harassment Claim**

Defendant Policlinica next argues that summary judgment should be granted in its favor on plaintiff Rodriguez's sexual harassment claim. (Docket No. 21 at pp. 10-18.) Plaintiff Rodriguez argues that he can make out a *quid pro quo* harassment claim and a hostile work environment claim. (Docket No. 30 at pp. 14-26.) The Court finds plaintiff Rodriguez's arguments unconvincing.

Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 200e-2(a). Sexual harassment is a form of sex-based discrimination. Quiñones v. Puerto Rico Hosp. Supply, Inc., 307 F.Supp.2d 352, 357 (D.P.R. 2004). Sexual harassment can be proven under a *quid pro quo* claim or a hostile work environment claim. Id.

1.   ***Quid Pro Quo* Sexual Harassment**

"[*Q*]*uid pro quo* harassment occurs when a supervisor conditions the granting of job benefits upon the receipt of sexual favors from a subordinate, or punishes that subordinate for refusing to comply with his/her sexual requests." Hernandez Loring v. Universidad Metropolitana, 186 F.Supp.2d 81, 86 (D.P.R. 2002). To prove a claim for *quid pro quo* sexual harassment, a plaintiff "must prove:  (1) that [he or] she was a member of a protected class; (2) that [he or] she was subject to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) that harassment complained of was based on sex; (4) that submission to the unwelcome advances was an express or implied condition for receiving job benefits, or that refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability." Id.

"Title VII's prohibition of discrimination because of sex protects men as well as women." Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 78 (1998) (internal quotation omitted).  Defendant Policlinica does not dispute that plaintiff Rodriguez is a member of a protected class.  See Docket No. 39. Rather, it focuses its arguments against *quid pro quo* harassment on

the second, third, and fourth elements of the claim. (Docket No. 39 at pp. 11-12.)

        In order to prove elements two and three, plaintiff Rodriguez argues that Dr. Chevres' constant meddling in his personal life was motivated by his gender, and that her "stalking behavior was further supplemented by 'explicit sexual conduct.'" (Docket No. 30 at pp. 19-20.)   The Policlinica counters that plaintiff Rodriguez has admitted that Dr. Chevres brushed her breast against him when he tried to show her something on his computer because she could not see well and that her interest in his personal life does not constitute sexual harassment.   (Docket No. 21 at pp. 15-17; Docket No. 39 at pp. 11-12.)   Plaintiff Rodriguez was often shocked because Dr. Chevres would inquire whether he was dating plaintiff Colon or a doctor, inquired why he failed to tell her that he had moved, and "would talk to him about things that she had to speak to [him] about and about things she didn't have to speak to [him] about."   (Docket No. 30-1 at p. 9, ¶ 10; p. 11, ¶¶ 23-28; p. 12, ¶ 30; p. 13, ¶¶ 36-40.)   Plaintiff Rodriguez states that the sexual harassment he suffered was when "he would be showing something to [Dr. Chevres] on the monitor, she could not see well so she would approach and brush against him." (Docket No. 21-1 at ¶ 24; Docket No. 30-1 at p. 6, ¶ 24.)

When considering both plaintiffs' statement of facts, a reasonable jury may or may not find that Dr. Chevres inquired into both plaintiffs' personal lives and that her inquiries made them uncomfortable.  While the facts surrounding Dr. Chevres' questioning remain disputed, the Court finds that they are not material and are irrelevant as a matter of law.  The First Circuit Court of Appeals has noted that anti-discrimination laws are not designed to address a supervisors' lack of professionalism. Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 46-47 (1st Cir. 2003).  In Lee-Crespo, the First Circuit Court of Appeals reviewed the grant of summary judgment on a sexual harassment claim that a saleswoman brought against her female manager.  Id. at 37. The saleswoman alleged that the manager discussed the private lives and sexual preferences of other employees at the company; made comments that the saleswoman was assigned her territory and did well because of her good looks; spread a rumor that the saleswoman was "crawling drunk" at a wedding; and made many inquiries into the saleswoman's life that made her feel uncomfortable.  Id. at 38-41. Similarly, plaintiff Rodriguez has experienced a supervisor inquiring into his personal life and commenting on the personal lives of co-workers.  While these types of inquiries are likely unprofessional and intrusive, they do not constitute sexual harassment.

Taking reasonable inferences in plaintiff Rodriguez's favor and assuming that Dr. Chevres wore tight, low-cut dresses to work and would not wear underwear, the Court finds such behavior does not support a *quid pro quo* claim because it is not gender-based harassment. "It does not appear that [plaintiff Rodriguez] was exposed to any disadvantageous condition of employment to which a female co-worker would not be exposed." Garcia v. V. Suarez & Co., 288 F.Supp.2d 148, 160 (D.P.R. 2003) (finding that male employees grabbing each others buttocks and talking about females, females' appearances, and what the males did with the females failed to constitute gender-based harassment because women were just as likely to be exposed to these conditions as men).

Plaintiff Rodriguez's only remaining sexual harassment allegation is that Dr. Chevres brushed her breasts against him while she was looking at his computer screen. Even assuming that a reasonable jury could find that there was a sexual advance based on gender, the Court finds that no reasonable jury could find it is a basis for a *quid pro quo* claim. Dr. Chevres never told plaintiff Rodriguez that he had to consent to the harassment in order to remain employed. (Docket No. 21-1 at ¶ 32; Docket No. 30-1 at p. 7, ¶ 32; Docket No. 21-2 at p. 129.)   In fact, when he was bothered by it, he asked her to stop and she

complied.  (Docket No. 21-1 at ¶ 26; Docket No. 30-1 at p. 6, ¶ 26;

Docket No. 21-2 at p. 107.)   While plaintiff Rodriguez contends

that sometimes she would forget and it would happen again, he does

not allege that Dr. Chevres even implicitly insinuated he had to

allow her to continue to brush her breasts against him in order to

stay employed.  Because plaintiff Rodriguez fails to establish that

Dr. Chevres ever insinuated that the maintenance of his employment

hinged on whether she could continue to brush against him, no

reasonable jury could find that he established a *quid pro quo*

claim.  See Rivera-Abella v. Puerto Rico Tel. Co., 470 F.Supp.2d

86, 108 (D.P.R. 2007) (finding that summary judgment should be

granted when the record did not contain any request for sexual

favors, the plaintiff only used conclusory statements to support

her claim, and that there was no connection made between the

plaintiff's rejection of such advances and "a tangible aspect of

her employment").  Thus, the Court **GRANTS** defendant Policlinica's

motion for summary judgment on plaintiff Rodriguez's *quid pro quo*

claim.

### 2.    Hostile Work Environment Sexual Harassment

Defendant Policlinica asks the Court to grant

summary judgment on plaintiff Rodriguez's hostile work environment

claim because even if the alleged events took place, "the isolated

events . . . were not severe or pervasive enough to create a

sexually hostile environment." (Docket No. 21 at p. 18.)
Plaintiff Rodriguez argues that even though he was able to get his
work done, Dr. Chevres' constant inquiries into his life, brushing
against him, and choice of revealing outfits amounted to a hostile
work environment. (Docket No. 30 at pp. 19-22.)

        A plaintiff can establish a hostile work environment
claim by showing "that the complained-of conduct was so severe or
pervasive that it altered the terms or conditions of [his or] her
employment." Pomales v. Celulares Telefonica, Inc., 447 F.3d 79,
83 (1st Cir. 2006). "'There is no mathematically precise test to
determine whether [a plaintiff] presented sufficient evidence' that
[he or] she was subjected to a severely or pervasively hostile work
environment." Id. (quoting Kosereis v. Rhode Island, 331 F.3d 207,
216 (1st Cir. 2003)). The Court examines "all the attendant
circumstances, including the frequency of the discriminatory
conduct; its severity; whether it was physically threatening or
humiliating, or a mere offensive utterance; and whether it
unreasonably interfered with an employee's work performance." Id.
(citing O'Rourke v. Providence, 235 F.3d 713, 729 (1st Cir. 2001)).
Because this examination is fact specific, it is normally best for
the jury to decide, but "summary judgment is an appropriate vehicle
for 'policing the baseline for hostile environment claims.'" Id.

Civil No. 11-2235 & Civil No. 11-2236 (FAB)                44

(quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (internal citations omitted)).

        Plaintiff Rodriguez's main complaint is that Dr. Chevres asked him many questions about his personal life, including his dating choices and where he was living. As discussed earlier, while these inquires were likely unprofessional and made plaintiff Rodriguez uncomfortable, this is not the kind of conduct anti-discrimination laws are designed to prevent. See Lee-Crespo, 354 F.3d at 46-47. As stated previously, Dr. Chevres' choice of revealing outfits is not the type of gender-motivated discrimination that Title VII protects because both male and female employees are subjected to the conduct. See Garcia v. V. Suarez & Co., 288 F.Supp.2d at 160. This leaves the incidents where Dr. Chevres brushed against plaintiff Rodriguez as the only supported allegation of sexual harassment that could be considered as contributing to a hostile work environment.

        "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins – thick

Civil No. 11-2235 & Civil No. 11-2236 (FAB)                     45

enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Suarez v. Pueblo Intern., Inc., 229 F.3d 49, 54 (1st Cir. 2000).

Plaintiff Rodriguez states that he was only uncomfortable around Dr. Chevres during the last three months of his employment. (Docket No. 21-1 at ¶ 31; Docket No. 30-1 at p. 7, ¶ 31; p. 14, ¶ 44.) While he does not state how often it happened, plaintiff Rodriguez claims that Dr. Chevres sexually harassed him when she brushed her breasts against him when she was looking at what he was showing her on the computer screen. (Docket No. 21-1 at ¶ 24; Docket No. 30-1 at p. 6, ¶ 24.) One time, when it bothered him, he asked her to keep her distance and she complied for some time. (Docket No. 21-1 at ¶ 26; Docket No. 30-1 at p. 6, ¶ 26; Docket No. 21-2 at p. 107.) He stated that she forgot after awhile and did it again. (Docket No. 21-1 at ¶ 26; Docket No. 30-1 at p. 6, ¶ 26; Docket No. 21-2 at p. 107.) While plaintiff Rodriguez says he felt humiliated about the situation, he never complained to anyone about the harassment. (Docket No. 21-1 at ¶ 29; Docket No. 30-1 at p. 7, ¶ 29.) Additionally, when he asked about his work performance, Dr. Chevres told plaintiff Rodriguez that he was doing excellent work. (Docket No. 30-1 at p. 14, ¶ 41.)

The Court finds that plaintiff Rodriguez has not established an actionable hostile work environment claim. His allegations are that Dr. Chevres brushed against him on an unidentified number of occasions, but when he asked her to stop, she did. He says that she forgot after awhile, but fails to say whether he asked her to stop again. He also states that he was able to get his work done without any complaints from Dr. Chevres. He was only bothered for three months. This is clearly within the realm of conduct that courts have found are not actionable pursuant to Title VII. See Morgan v. Massachusetts Gen. Hosp., 901 F.2d 186, 192-93 (1st Cir. 1990) (finding that a male co-worker standing behind the plaintiff to cause physical contact; looking at the plaintiff's privates in the restroom; and engaging in unwanted touching over a two week period was not sufficiently severe or persuasive to be actionable pursuant to Title VII); Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 782-83 (1st Cir. 1990) (commenting that it is highly doubtful that five sexual advances by a supervisor "[c]ould be considered sufficiently severe or pervasive to support" a hostile work environment claim pursuant to Title VII). Because a supervisor brushing up against an employee as she is looking over his shoulder to view something on a screen is not "severe or pervasive" enough to support a hostile work environment

claim, the Court **GRANTS** defendant's motion for summary judgment on plaintiff Rodriguez's hostile work environment claim.

### D.   Plaintiff Colon's Retaliatory Hostile Work Environment

Defendant Policlinica next asks the Court to grant summary judgment on plaintiff Colon's retaliatory hostile work environment claim because her arguments fail to support her claim. (Docket No. 39 at pp. 16-17.)  To establish a claim for retaliation pursuant to Title VII, "a plaintiff must show (1) that he or she engaged in protected conduct; (2) that he or she suffered an adverse employment action' and (3) that the adverse employment action was causally connected to the protected conduct." Moreno-Rivera v. DHL Global Forwarding, 762 F.Supp.2d 397, 404 (D.P.R. 2011).  Pursuant to Title VII, "the creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action under 42 U.S.C. § 2000e-3(a)." Noviello v. City of Boston, 398 F.3d 76, 89 (1st Cir. 2005).  In order to show that she was subject to a hostile work environment, a plaintiff must show: "(1) that she [or he] is a member of a protected class; (2) that she [or he] was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and

subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established." Moreno-Rivera, 762 F.Supp.2d at 405 (internal citations omitted). Because this inquiry is fact specific, it is normally left for a jury to decide, but "summary judgment is an appropriate vehicle for policing the baseline for hostile environment claims." Id. (quoting Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006)).

### 1.    Protected Conduct

Outside of participating in a formal proceeding opposing sexual harassment, an employee has engaged in a protected activity pursuant to Title VII if he or she "opposed any practice made an unlawful employment practice by Title VII." Fantini, 557 F.3d at 32 (internal citations omitted). The opposition clause protects "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges. Id. (internal citations omitted). Plaintiff Colon alleges that she opposed what she believed to be Dr. Chevres' unlawful conduct when she told Dr. Chevres that she could no longer be held responsible for the previous sexual harassment she suffered

at the hands of Dr. Chevres' husband.  She referenced her own complaint in support of this argument.  See Docket No. 30 at p. 29. The Court may "disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment."  Loc. Rule 56(e).  The complaint is not a part of the record considered for summary judgment.  See Fed.R.Civ.P. 56(c). Additionally, this argument is circular because plaintiff Colon seems to allege she was subjected to a hostile work environment for opposing the hostile work environment.

     Alternatively, plaintiff Colon seems to allege she was retaliated against because she reported Dr. Chevres' husband's harassment years earlier.  Plaintiff Colon also states that Dr. Chevres asked her to stay following the harassment, promoted her, and they became friends in the years between.  (Docket No. 22-1 at ¶¶ 10 & 12; Docket No. 30-2 at p. 2, ¶ 10; p. 3, ¶ 12; Docket No. 30-8 at p. 35.)  No reasonable jury would find that there is a connection between plaintiff Colon reporting this earlier sexual harassment and Dr. Chevres' later treatment of her because of the great length of time and friendship that developed between the two in the years between.  Even if plaintiff Colon could establish some connection, however, the statute of limitations has run. Therefore, taking all reasonable inferences in favor of the non-

moving party, no reasonable jury could find that plaintiff Colon engaged in conduct protected by Title VII.

### 2.   Hostile Work Environment Claim

Plaintiff Colon has established that she is a member of a protected class because of her gender.  Plaintiff Colon contends that the harassment she suffered was Dr. Chevres' interrogations about her relationship with plaintiff Rodriguez and the loud tone of voice Dr. Chevres used when speaking to her. (Docket No. 30 at pp. 30-32.)

Plaintiff provides examples of the interrogation: Dr. Chevres addressed plaintiff Colon in a loud tone of voice and repeatedly said, "Everything Ok?, Everything Ok? Well, that's the way it should be."  (Docket No. 30-2 at p. 9, ¶ 20; p. 11, ¶ 39.) Dr. Chevres also warned her, saying, "Do not make me act as another type of boss."  (Docket No. 30-2 at p. 12, ¶ 42.)  She alleges that Dr. Chevres used a tone of voice that made her know that Dr. Chevres was threatening her to stay away from plaintiff Rodriguez.  (Docket No. 30-2 at p. 9, ¶ 22.)  Plaintiff Colon also alleges that Dr. Chevres warned her to stay away from plaintiff Rodriguez and that plaintiff Colon's children would be grateful if she did.  (Docket No. 30-2 at p. 12, ¶ 44.)  She also alleges that Dr. Chevres said negative things about her to plaintiff Rodriguez and other people.  (Docket No. 30-1 at p. 11, ¶ 22.)

Plaintiff Colon fails to establish that Dr. Chevres' inquiries were motivated by gender because plaintiff Rodriguez, a male, was subjected to the same inquiries. Additionally, no reasonable jury could reasonably find that the questions and loud tone of voice Dr. Chevres used over approximately a month (between November 1, 2010 and December 2, 2010 when she reported to the SIF) constituted an objectively hostile work environment. See Lee-Crespo, 354 F.3d at 46-47 (finding that a manager discussing the private lives and sexual preferences of other employees at the company; making comments that the saleswomen was assigned her territory and did well because of her good looks; spread a rumor that the saleswomen was "crawling drunk" at a wedding; and made many inquiries into the saleswomen's life that made her feel uncomfortable was not the type of conduct that Title VII was designed to combat).

Because plaintiff Colon cannot establish that she engaged in protected conduct or suffered from a hostile work environment, the Court declines to address the third element of whether there is a causal connection between the first two elements. Accordingly, the Court **GRANTS** defendant's motion for summary judgment on plaintiff Colon's retaliatory hostile work environment claim.

**E.   Plaintiff Colon's Constructive Discharge Claim**

Defendant Policlinica requests the Court to grant its motion for summary judgment on plaintiff Colon's constructive discharge claim because plaintiff Colon was discharged from SIF and told she could return to work, but she refused and resigned without attempting to return.  (Docket No. 39 at p. 18.)  Plaintiff Colon argues that the fact that she resigned so quickly after her release from SIF supports her contention that she was constructively discharged.  (Docket No. 30 at pp. 36-37.)  She also states that she became depressed because she was subjected to an objectively hostile and aggressive work environment.  Id.

To establish a constructive discharge claim, "a plaintiff must show working conditions so intolerable that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities." Serrano-Nova v. Banco Popular de Puerto Rico, Inc., 254 F.Supp.2d 251, 262 (D.P.R. 2003) (internal quotations omitted).  A prima facie constructive discharge claim requires a plaintiff to establish that he or she:  (1) was within a protected class; (2) met the employer's legitimate performance expectations; (3) was actually or constructively discharged; and (4) was replaced by another with similar skills and qualifications. Id. at 262-63.  The standard for showing that his or her working conditions were so difficult that he or she was compelled to resign

is an objective one; it "cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held." Suarez, 229 F.3d at 54. "Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case . . . [T]he only variation between the two claims is the severity of the hostile working conditions." Acosta v. Harbor Holdings & Operations, Inc., 674 F.Supp.2d 351, 362 (D.P.R. 2009) (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 149 (2004)).  "The mere existence of a hostile work environment, however, is often not enough to support a finding of a constructive discharge." Serrano-Nova, 254 F.Supp.2d at 263 (internal quotations omitted).  As noted previously, plaintiff Colon fails to establish that she was subjected to a hostile work environment. Because plaintiff Colon would have to establish, at a minimum, that she was subject to a hostile work environment before she could begin to establish a constructive discharge claim, the Court **GRANTS** defendant's motion for summary judgment on this claim.

### F.   **Plaintiffs' Puerto Rico Commonwealth Claims**

Plaintiffs and defendant Policlinica both acknowledge that the Commonwealth claims plaintiffs bring are virtually identical to the Title VII claims.  (Docket No. 21 at pp. 21-23; Docket No. 22 at pp. 20-22; Docket No. 30 at p. 38.)  Both plaintiffs and the Policlinica agree that the success of

plaintiffs' Commonwealth claims hinge on the success of plaintiffs' Title VII claims; they also agree that if plaintiffs' Title VII claims do not survive then their Commonwealth claims fail as well. See id. Defendant Policlinica asks the Court to grant summary judgment on plaintiffs' Commonwealth claims, arguing that no reasonable jury would be able to find for plaintiffs on their Commonwealth claims for the same reasons as the Title VII claims. Alternatively, they request that the Court decline to exercise its jurisdiction over their Commonwealth claims.  (Docket No. 21 at pp. 21-23; Docket No. 22 at pp. 20-22.)  Plaintiffs argue that summary judgment should not be granted because they can establish the Title VII claims and, therefore, can establish the Commonwealth claims as well.  (Docket No. 30 at p. 38.)  Because the Court has found that plaintiffs' Title VII claims fail to survive summary judgment, the Court also **GRANTS** defendant's motion for summary judgment on plaintiffs' Commonwealth claims.

**V.    CONCLUSION**

Plaintiffs fail to present sufficient evidence to establish issues of material fact to rebut defendants' motions for summary judgment.  For the reasons stated above, defendants' motions for summary judgment are **GRANTED**.  Both cases, 11-2235 and 11-2236 are **DISMISSED WITH PREJUDICE.**

Judgments shall be entered accordingly.

Civil No. 11-2235 & Civil No. 11-2236 (FAB)                    55

**IT IS SO ORDERED.**

San Juan, Puerto Rico, April 29, 2013.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE